Thomas A. Telesca, Esq.
Jacqueline A. Fink, Esq. (*to be admitted pro hac vice*)
RUSKIN MOSCOU FALTISCHEK, P.C.
1425 RXR Plaza
East Tower, 15th Floor
Uniondale, New York 11556
(516) 663-6670
ttelesca@rmfpc.com
*Attorney for Plaintiffs, Hillary Tomack and Michael Tomack*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---------------------------------- x
HILLARY P. TOMACK and MICHAEL J. TOMACK,

        Plaintiffs,

  -against-

EXPECT REALTY INC., FIRST ESCROW ONE LLC, JOHNATHAN KAINE, BILLY HAYES, and DAVID TODD,

        Defendants.
---------------------------------- x

**COMPLAINT AND JURY DEMAND**

CIVIL ACTION
DOCKET NO. 24-cv-10660

Plaintiffs, Hillary P. Tomack and Michael J. Tomack ("Plaintiffs" or the "Tomacks"), by their attorney, Ruskin Moscou Faltischek P.C., as and for their Complaint against defendants Expect Realty Inc., First Escrow One LLC, Johnathan Kaine, Billy Hayes, and David Todd (collectively the "Defendants"), allege as follows:

**STATEMENT OF THE CASE**

1.     This is a fraud action arising from the sale of Plaintiffs' vacation club membership.

2.     Defendants have orchestrated an elaborate scheme involving multiple parties, fake "official" government documents and bank statements to swindle Plaintiffs out of nearly $200,000

1

in purported "fees," "taxes," and other expenses under the guise of selling their vacation club membership.

3. Plaintiffs seek compensatory and punitive damages against Defendants.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332 (a)(1), as the matter in controversy exceeds the sum or value of $75,000.00, and is between citizens of different states.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events occurred in this judicial district, which gave rise to this claim. Additionally, Defendants availed themselves of this district because, among other things, they solicited Plaintiffs into doing business with them in this jurisdiction.

## THE PARTIES

6. Plaintiff Hillary Tomack is an individual domiciled in the State of New Jersey, with an address at 123 Country Club Drive, Monroe, New Jersey 08831.

7. Plaintiff Michael Tomack is an individual domiciled in the State of New Jersey, with an address at 123 Country Club Drive, Monroe, New Jersey 08831.

8. Upon information and belief, defendant Expect Realty Inc. is a Massachusetts corporation with its principal place of business at 1 Union Street, Boston, Massachusetts 02108.

9. Upon information and belief, defendant First Escrow One LLC is a Missouri limited liability company with its principal place of business at 1101 McGee Street, Kansas City, Missouri 64106.

10. Upon information and belief, defendant Johnathan Kaine, an individual, is the Chief Executive Officer for Expect Realty Inc. and is a resident of the State of Massachusetts. Johnathan

Kaine dominates and controls Expect Realty Inc.'s business activities, including the business activities hereinafter alleged.

11. Upon information and belief, defendant Billy Hayes, an individual, is a resident of the State of Massachusetts and the Real Estate Advisor for Expect Realty Inc. who solicited Plaintiffs in the State of New Jersey.

12. Upon information and belief, defendant David Todd, an individual, is a resident of the State of Massachusetts and the Senior Broker for Expect Realty Inc., who also solicited Plaintiffs.

## BACKGROUND

13. In or about February, 2004, Plaintiffs purchased a Vacation Club Membership/timeshare for $40,000.00 (the "Membership") from the Royal Holiday Club ("Royal").

14. The Royal Membership was worth 30,000 points annually.

15. Plaintiffs' 30,000 Membership points could be used towards vacations in different Royal locations.

16. Plaintiffs used their Membership for nearly twenty years without issue.

17. In or about October 2023, defendant Expect Realty Inc. ("Expect Realty") solicited Plaintiffs to broker a sale of Plaintiff's Membership.

18. In or about mid-October 2023, defendant Billy Hayes ("Ms. Hayes") purportedly acting on behalf of Expect Realty solicited Plaintiffs in New Jersey by calling plaintiff Hillary Tomack's cellular telephone number.

19. Upon information and belief, Defendants obtained a list of Royal members contact information top solicit them to purportedly sell their Memberships while extracting excessive monies in the form of "fees," "taxes," and other expenses.

20. On their first call, Ms. Hayes represented to Mrs. Tomack that Expect Realty had extensive experience brokering the sale of vacation club memberships.

21. On or about October 26, 2023, Ms. Hayes, purportedly on behalf of Expect Realty, emailed a "Business Proposal" to Plaintiffs in New Jersey to broker the sale of their Membership (the "Proposal").

22. The Proposal had a purchase price of $64,750.00 for Plaintiffs' Membership.

23. Ms. Hayes held herself out in the Proposal as Plaintiff's "Real Estate advisor."

24. In the Proposal, Ms. Hayes did not advise Plaintiff's on any fees, taxes or other expenses which would be required to be paid by Plaintiffs as part of the sale of their Membership.

25. Between October 2023 and January 2024, Mrs. Tomack and Ms. Hayes spoke several times about the sale of the Tomack's Membership and, in particular, about the sale price.

26. At no time prior to January 2024, did Ms. Hayes advise Plaintiffs of any fees, taxes or other expenses which would be required to be paid by Plaintiffs as part of the sale of their Membership.

27. By in or about early January 2024, Ms. Hayes informed Plaintiffs that Expect Realty had a buyer for Plaintiffs' Membership.

28. On or about January 3, 2024, Expect Realty emailed Plaintiffs in New Jersey a proposed Sales Agreement for the purchase of their Membership (the "Original Sales Agreement").

4

29. The Original Sales Agreement defined Expect Realty as the "Transactional Buyer" and Plaintiffs as the "Seller."

30. The Original Sales Agreement had a Purchase Price of $118,900.00.

31. The Original Sales Agreement stated that the Transactional Buyer would be entitled to a transfer commission of 5%, or $5,945.00.

32. The Original Sales Agreement stated that Plaintiffs would advance and be reimbursed by the yet to be defined Buyer at closing for only two expenses: (1) the acquisition of a tax identification number from the Mexican government, referred to as the R.F.C., in the amount of $4,256.84; and (2) $1,060.00 for a unit maintenance fee.

33. The Original Sales Agreement did not require Plaintiffs to pay any other fees, taxes or expenses to close.

34. Plaintiffs and defendant David Todd, purportedly acting on behalf of Expect Realty, signed the Original Sales Agreement.

35. On or about January 17, 2024, defendant David Todd, purportedly acting on behalf of Expect Realty, and plaintiffs Hillary and Michael Tomack each signed a revised Sales Agreement (the "Revised Sales Agreement").

36. The Revised Sales Agreement had the same terms and conditions as the Original Sales Agreement except Section 1(b) was amended and Section 6(c) was added.

37. The amended Section 1(b) in the Revised Sales Agreement made clear that the Plaintiffs agreed to advance the cost of the Mexican tax identification number, or R.F.C.

38. The Revised Sales Agreement did not did not require Plaintiffs to pay any other fees, taxes or expenses to close on the sale of their Membership.

39. Section 6(c) of the Revised Sales Agreement allowed Plaintiffs to use the timeshare in March of 2024.

40. Under Section 20, the terms of the Revised Sales Agreement expired within 90 days, or by April 16, 2024.

41. Per Section 1 of the Revised Sales Agreement, the still the yet to be defined Buyer had already deposited 100% of the Purchase Price along with the two expenses for which Plaintiffs, as Seller, would be reimbursed: the cost of the R.F.C. and maintenance fees in the total amount of $124,218.84.

42. On or about January 22, 2024, defendant First Escrow One LLC ("First Escrow"), purportedly at the direction of Expect Realty, sent Plaintiffs in New Jersey a closing package.

43. According to First Escrow, it would facilitate the closing.

44. The Escrow Agreement from First Escrow stated that the purchaser of Plaintiff's Membership was "Nova Capital Inversionistas," a Spanish company.

45. Agnes de la Mora signed the Escrow Agreement on behalf of Nova Capital Inversionistas.

46. Upon information and belief, Agnes de la Mora is not a real person.

47. First Escrow represented that it had arranged for Santander Bank in Mexico City to hold the Purchase Price and the additional funds paid by Nova Capital Inversionistas to be reimbursed to Plaintiffs at closing for the tax identification number and maintenance fees in the total amount of $124,218.84 in an Irrevocable Cross-Border Account no. 23-00092792-8.

48. First Escrow provided Plaintiffs with the application for the Mexican tax identification number for the same amount in the Revised Sales Agreement.

49. On or about January 25, 2024, at the direction of First Escrow, Plaintiffs paid the $4,256.84 fee to Getsol Consultores Y Estrategias, S.A. de C.V. for Mexican tax identification number.

50. Previously, on or about December 20, 2023, Plaintiffs had also paid the $1,060.00 in maintenance fees.

**A.  The Beginning of Expect Realty's Previously Undisclosed "Taxes" and "Fees"**

51. According to Escrow Agreement, the closing was scheduled for February 23, 2024.

52. Leading up to the closing date, Plaintiffs began to receive multiple demands from Expect Realty and First Escrow to pay additional "taxes" and "fees," which were never previously disclosed to them by Defendants.

53. On or about February 2, 2024, First Escrow sent Plaintiffs a purported "Capital Gains" invoice for $13,445.74 from the Hacienda y Credito Publico aka the Mexican Ministry of Finance which was required to be paid before closing.

54. To induce Plaintiffs into paying the purported "Capital Gains" tax, on or about February 12, 2024, Expect Realty emailed Plaintiffs in New Jersey an Addendum to the Sales Agreement (the "Addendum").

55. According to the Addendum, executed by Expect Realty and Plaintiffs, the amount of the "Capital Gains" tax had already been deposited into Plaintiffs' account at Santander Bank by the "Buyer," Nova Capital Inversionistas.

56. On or about February 22, 2024, First Escrow, acting in concert with Expect Realty, sent wire instructions to Plaintiff for the purported "Capital Gains" tax to be wired to Getsol Consultores Y Estrategias, S.A. de C.V.

57. On or about February 23, 2024, Plaintiffs wired $13,445.74 to Getsol Consultores Y Estrategias, S.A. de C.V.

58. On or about February 28, 2024, First Escrow then sent Plaintiffs a purported invoice for a separate "State Tax" in the amount of $17,835.00 from the Hacienda y Credito Publico aka the Ministry of Finance which was required to be paid before closing.

59. On or about March 11, 2024, Plaintiffs paid the "State Tax" invoice of $17,835.00 to Getsol Consultores Y Estrategias, S.A. de C.V.

60. Despite Plaintiffs' payment of the aforesaid "fees" and "taxes," the closing still did not occur.

61. In or about early April, 2024, First Escrow, acting in concert with Expect Realty and the other Defendants, sent Plaintiffs an invoice for a purported "Customs Clearance" fee of $5,450.00.

62. On or about April 8, 2024, Plaintiffs paid the purported "Customs Clearance" fee of $5,450.00 to Getsol Consultores Y Estrategias, S.A. de C.V.

63. Throughout this time, First Escrow sent Plaintiffs purported Santander Bank statements which by April 2024 showed a balance of $160,994.58 comprised of the Purchase Price, tax identification number (R.F.C.) and maintenance fees, a wire transfer fee, capital gains tax, state tax, and customs clearance fee.

64. Upon information and belief, the Santander Bank statements were fake.

65. On or about April 15, 2024, First Escrow forwarded Plaintiffs a purported letter from Santander Mexico, S.A. informing Plaintiffs of "irregularities" involving an allegation of money laundering with their account and requiring Plaintiffs to pay an insurance bond in the

amount of 20% of their balance, or $32,198.91, in order to release the funds and close on the sale of their Membership.

66. On or about April 18, 2024, to induce Plaintiffs into sending Defendants additional monies, Expect Realty emailed Plaintiffs a Promissory Note (the "Note"). The Note stated that once Plaintiffs paid for the insurance bond of $32,198.91, Santander Bank would release the $160,994.58 in the account to Plaintiffs to close on the Membership. Expect Realty and David Todd represented in the Note to Plaintiffs that they would refund Plaintiffs the insurance bond amount, once the funds were released at closing.

67. On or about April 19, 2024, Plaintiff wired $32,198.91 to Getsol Consultores Y Estrategias, S.A. de C.V. for the insurance bond.

68. On or about May 2, 2024, First Escrow informed Plaintiffs that the funds purportedly being held by Santander were transferred to another bank in Mexico, BBVA Mexico, S.A. ("BBVA").

69. Plaintiffs also received statements from BBVA, which upon information and belief, were also fake.

70. On or about May 8, 2024, BBVA purportedly notified Plaintiffs through First Escrow of the same "irregularities" as with their Santander account requiring them to pay $38,638.69 for another insurance bond.

71. The $38,638.69 was 20% of the new purported balance in the BBVA account after adding the amount of the Santander insurance bond of $32,198.91 to the prior balance $160,994.58.

72. At that point, Plaintiffs sought to cancel the transaction, but were told by David Todd that any cancellation would lead to a court proceeding in Mexico.

73. On or about May 16, 2024, to induce Plaintiffs to pay for the second insurance bond, defendant David Todd sent Plaintiffs a Bilateral Agreement in which it was represented that once Plaintiffs paid for the second insurance bond, BBVA would release $193,193.49 to Plaintiffs, representing the Purchase Price plus all purported "fees," "taxes," and other expenses paid to date by Plaintiffs.

74. Expect Realty and David Todd further represented in the Bilateral Agreement that they would reimburse Plaintiffs for the cost of the second insurance bond.

75. On or about May 17, 2024, First Escrow sent Plaintiffs the wire instructions for the second insurance bond.

76. On or about May 21, 2024, Plaintiffs wired $38,638.69 to Getsol Consultores Y Estrategias, S.A. de C.V. for the second insurance bond.

77. In or about May 2024, Expect Realty advised Plaintiffs that the "Buyer" had backed out of the transaction and that Expect Realty would purchase Plaintiffs Membership directly subject to the payment of a "New Buyer Transfer Fee."

78. On or about May 30, 2024, in order to induce Plaintiffs to pay an additional "New Buyer Transfer Fee," Expect Realty and David Todd sent Plaintiffs a second Bilateral Agreement.

79. On or about June 6, 2024, First Escrow sent wire instructions for the payment of the "new buyer transfer fee" to Econstrucciones Cifarelli, S.A. de C.V.

80. On or about June 6, 2024, Plaintiffs again sought to cancel the transaction and requested the return of the approximately $111,000 in "fees," "taxes," and other expenses they had paid to date.

81. On or about June 7, 2024, Plaintiffs, a captive Seller by this point, who did not want sale to lose the substantial "fees," "taxes," and other expenses they had paid to date based on

Defendants' representations, executed the second Bilateral Agreement in which it was agreed that once Plaintiffs paid the "new buyer transfer fee" of $19,900.00, BBVA would release the $193,193.49 to close on the sale of the Membership.

82. In the second Bilateral Agreement, Expect Realty and David Todd "guarantee[d]" that they would reimburse Plaintiffs for the cost of the second insurance bond and the "new buyer transfer fee."

83. To further induce Plaintiffs to pay the "new buyer transfer fee," in the second Bilateral Agreement, Expect Realty and David Todd also represented that they would "guarantee" the payment of $10,000 in "compensation" and $20,982 in "overhead" to Plaintiffs.

84. On or about June 10, 2024, Plaintiffs paid the "new buyer transfer fee."

**B. Johnathan Kaine's Personal Guarantees**

85. In or about mid-June of 2024, Expect Realty's purported CEO, defendant Johnathan Kaine, informed Plaintiffs that David Todd had been arrested on bribery charges in Mexico and that Mr. Kaine would travel to Mexico to "save the deal."

86. In order to induce Plaintiffs to pay further monies to Defendants, on or about June 28, 2024, Plaintiffs received an email from Mr. Kaine attaching a settlement guarantee stating that he arrived in Mexico and paid a total of $15,000.00 on behalf of Plaintiffs to the Law Firm of Despacho Juridico Garza & Asociados to release Plaintiffs' funds with BBVA.

87. In the settlement guarantee, Mr. Kaine requested that Plaintiffs pay the $15,000.00 in legal fees for the Mexican lawyers to file the paperwork necessary to release the $193,193.49 currently held at BBVA in order to close the transaction.

88. In the settlement guarantee, to further induce Plaintiffs to pay additional monies, Mr. Kaine represented that he would reimburse Plaintiffs for the monies they "invested" to date in

addition to paying "compensation" of $10,000.00, "overhead" of $20,982.00, and the attorney's fees of $15,000.00.

89. On or about July 10, 2024, Plaintiffs wired $15,000 in attorney's fees to Getsol Consultores Y Estrategias, S.A. de C.V.

90. The sale of the Membership still did not close.

91. In or about early August, 2024, Mr. Kaine informed Plaintiffs that despite the work of the Mexican law firm, the Mexican Ministry of Finance purportedly required an additional 25% tax payment on the amount still purportedly being held in the BBVA account, or $48,298.37, to release the funds and close the sale of the Membership.

92. On or about August 9, 2024, First Escrow sent Plaintiffs a letter from the Mexican Ministry of Finance in which the Ministry purported to reduce the tax to $40,248.64.

93. On or about August 22, 2024, Mr. Kaine sent yet another settlement guarantee stating that if Plaintiffs paid the twenty five percent (25%) tax,

> I, Johnathan Kaine assure and guarantee the release of [Plaintiffs'] net holdings in BBVA Banking Institution in the amount of $193,193.49 USD within 5 business days. If for any reason this release should held up or not take place within the timeline stated, I will authorize for Mr. and Mrs. Tomack to be paid in full the total amount due, the following business day from my Corporate Chase Account, the sum of $193,193.49 USD currently held within BBVA Banking Institution as well as the requirement stated above in the amount of $120,159.00 USD at Closing, for a total of $313,352.49 USD.

94. On or about September 9, 2024, Plaintiffs paid the reduced 25% tax in the amount of $40,248.64.

95. Five business days later, on or about September 4, 2024, Plaintiffs received neither the $193,193.49 from BBVA nor the total $120,159.00 despite having paid the additional tax and all other "fees, "taxes," and other expenses to date..

12

96. On or about September 11, 2024, First Escrow emailed Plaintiffs concerning the arrest of Victor Cabrera Gonzalez.

97. On or about September 23, 2024, Mr. Kaine informed Plaintiffs that their last three payments totaling $75,148.64 for the "new buyer transfer fee," attorney's fees, and reduced 25% tax, had purportedly been embezzled by Victor Cabrera Gonzalez, a Mexican government employee.

98. Mr. Kaine claimed that Victor Cabrera Gonzalez was awaiting trial in the Federal Criminal Trial District in Mexico.

99. In yet another settlement guarantee, Mr. Kaine set forth three options for Plaintiffs. First, wait until the purported criminal proceedings conclude in 2-4 years. Second, cancel the sale and forfeit the two insurance bonds totaling just over $70,000.00. Third, comply with a purported Mexican court order and repay the $75,000 in embezzled funds to allow the $193,193.49 to be released from the BBVA account. Mr. Kaine represented to Plaintiffs that he would reimburse them for their out-of-pocket losses to date if the funds were not released from BBVA.

100. This was the last straw for Plaintiffs. After countless misrepresentations and broken promises by Ms. Hayes, Mr. Todd, and Mr. Kaine to either pay Plaintiffs back or close the deal, Plaintiffs refused to send additional funds.

101. To date, Mr. Kaine continues to insist that if Plaintiffs continue to pay fees and the sale does not close, he will reimburse them.

102. More recently, after Plaintiffs engaged counsel and threatened legal action, in his latest settlement guarantee sent on or about October 31, 2024, Mr. Kaine stated in addition to reimbursing Plaintiffs for their out-of-pocket costs, he would pay them compensation of $145,000.00 to avoid court proceedings for "their inconveniences and delays in closing."

103. On about November 6, 2024, Mr. Kaine, purportedly on behalf of Expect Realty, sent Plaintiffs a Cancellation Notice cancelling the purported Sales Agreement which by its own terms had already expired by April 2024.

104. Rather than continue to be swindled and bullied by Mr. Kaine and the other Defendants, Plaintiffs are seeking compensatory and punitive damages.

105. Upon information and belief, Plaintiffs are not the only victims of Defendants' scheme to defraud.

106. According to the a post on the Better Business Bureau (BBB) scam tracker, another New Jersey resident suffered the same fate at the hands of Mr. Kaine. Mr. Kaine merely changed the names of the realty company, escrow agent, and names of his co-conspirators. The purported "fees," "taxes," and other expenses were the same and so was the purported buyer: Agnes de la Mora of Nova Capital.

## FIRST CLAIM FOR RELIEF
### (Fraud)

107. Plaintiff incorporates all prior allegations as if set forth fully herein.

108. Defendants falsely represented to Plaintiffs that they would broker and consummate the sale of their Membership.

109. Defendants further falsely represented to Plaintiffs that if Plaintiffs paid previously undisclosed "fees," "taxes," and other expenses, those out-of-pocket costs would be reimbursed by the buyer or Defendants and the transaction would still close.

110. Defendants knew that they would not sell Plaintiffs' Membership and instead would use the purported sale as a means to extract monies from Plaintiffs under the guise of alleged "fees," "taxes," and other expenses.

111. Defendants intended for Plaintiffs to rely on their misrepresentations in order to perpetrate their scheme to defraud.

112. Indeed, Plaintiffs did rely on Defendants' misrepresentations as other reasonable persons would and paid the "fees," "taxes," and all other expenses alleged above, which ultimately resulted in the damages described herein.

113. Accordingly, Plaintiffs are entitled to judgment against Defendants in an amount to be determined at trial believed to equal or exceed $188,033.80, plus interest as provided by law and punitive damages in the amount of $5,000,000.00.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

114. Plaintiff incorporates all prior allegations as if set forth fully herein.

115. The note, Bilateral Agreements, and guarantees set forth herein constitute valid, binding and enforceable contracts between Expect Realty and/or Mr. Todd or Mr. Kaine, as the case may be, on the one hand, and Plaintiffs, on the other.

116. Plaintiffs performed under those contracts by paying the required "fee," "tax," or other expense required thereunder.

117. Defendants Expect Realty and/or Mr. Todd or Mr. Kaine, as the case may be, breached those contracts by failing to reimburse Plaintiffs and close the sale of their Membership.

118. As a result of those breaches, Plaintiffs suffered damages.

119. Plaintiffs are entitled to judgment against Defendants in an amount to be determined at trial believed to equal or exceed $313,352.49, plus interest as provided by law.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants awarding damages as permissible by law, including, but not limited to (a) the amount of at least $188,033.80 plus interest provided by law, (b) punitive damages, and (c) such other and further relief as the Court may deem just and proper, together with the costs and disbursements, which Plaintiffs have incurred in connection with this action.

        Respectfully submitted,

        RUSKIN MOSCOU FALTISCHEK, P.C.


        By:_____*/s/ Thomas A. Telesca*_____
            Thomas A. Telesca, Esq.
            Jacqueline A. Fink, Esq. *(to be admitted pro hac vice)*
            *Attorney for Plaintiffs*
            1425 RXR Plaza
            East Tower, 15th Floor
            Uniondale, New York 11556
            ttelesca@rmpf.com
            (516) 663-6600

Dated: Uniondale, New York
       November 21, 2024

1039333